UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.

TONAWANDA COKE CORPORATION and
MARK L. KAMHOLZ,

                    Defendants.

**DECISION AND ORDER**
10-CR-219S

## I.  INTRODUCTION

This matter is scheduled for sentencing on Defendants' convictions for violations of the Clean Air Act, 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2, and the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 2, all of which are class D felonies.  Defendant Mark L. Kamholz alone was convicted of obstruction of an administrative proceeding in violation of 18 U.S.C. § 1505 and 18 U.S.C. § 2, also a class D felony. The following sentencing decision addresses motions and objections raised in the parties' sentencing submissions, and is also intended to provide a background for this Court's pronouncement of sentence on March 19, 2014.

Specifically, this Court will first address the Government's motion for a sentencing hearing for the purposes of determining whether certain community members are victims as defined by the Crime Victims' Rights Act, 18 U.S.C. § 3771.  Such a designation assures certain rights to a victim, including the right to speak at sentencing and the right to restitution for any harm caused by Defendants' criminal conduct.

1

Defendants have also requested a sentencing hearing at which their experts would be permitted to testify regarding factors reflecting the seriousness of the convicted offenses relative to other environmental crimes. These factors include the lack of proof of environmental harm, the purported ineffectiveness of the baffle system with respect to the Clean Air Act offenses, and the atypical agency proceedings that resulted in the criminal charges. Because this Court is declining the hearing request, this decision will also discuss those factors on which this Court will rely in determining an appropriate sentence for each Defendant, including Defendant Kamholz's objection to his offense level calculation.

Next, this Court will resolve Defendant Tonawanda Coke's objection to the imposition of any term of probation that would require the company to fund a community service project. Finally, the Court will explain how it will proceed in resolving the issue of Defendant Tonawanda Coke's ability to pay a significant fine.

## II. DISCUSSION

### A.  Designation of Individual Victims

There is no question that this case is one of extreme importance to the Tonawanda and Grand Island communities. Prompted by concerns regarding the black soot they were regularly seeing over their property and the number of family members and neighbors that were being diagnosed with various forms of cancer, community members independently organized to conduct their own testing in an effort to better understand what effect the nearby industrial plants were having on themselves and their families. Their activities prompted the commencement of the air quality study by the New York State Department of Environmental Conservation in 2007, and it was this study that ultimately highlighted the

2

increased concentration of benzene, a known carcinogen, near the Tonawanda Coke plant.

The Government reflects this community concern in its initial sentencing memorandum, asserting that, although it could not "point to any particular individual victim, there can be no dispute that through the [D]efendants' widespread contamination of the air and ground, that all of Tonawanda has suffered." (Docket No. 216 at 32.) At the status conference in October 2013, this Court requested that the Government provide authority for its argument that the community as a whole could be considered a victim of the offenses on which Defendants were convicted. (Docket No. 260 at 17.) The Government asserts that in preparing to respond to the Court's request, it reevaluated the 128 impact statements previously submitted by individual community members. (Docket No. 261 at 2-3; Docket No. 228, 230, 231.) "Based on this factual and legal review, the legislative history of the [Crime Victims' Rights Act, 18 U.S.C. § 3771], and the [G]overnment's ongoing commitment to advocate on behalf of all deserving victims harmed by the [D]efendants' crime, the [G]overnment submits that in this case the harms inflicted by the [D]efendants extend to individuals who were forced to breathe benzene-contaminated air illegally and deliberately released by the defendants." (Docket No. 261 at 3.)

This is, of course, a change in position from the Government's prior agreement with the conclusion in the presentence report ("PSR") that "the environmental impact and potential victim injury or loss is immeasurable and a causal link cannot be definitively defined." (Docket No. 261 at 3 n. 1.) The Government highlights, however, that the PSR ultimately concluded that "the instant offense is not a property offense and did not involve victim *injury or loss*." (Id. (emphasis in original).)

3

Therefore, it appears that the Probation Department, similar to the government's initial position regarding victim status, focused on whether identifiable persons suffered a physical injury rather than acknowledging that victim status may attach as a result of psychological and emotional harm from being forced to breathe noxious gases illegally released by the defendants.  Importantly, the government does agree with the PSR that at present, there is insufficient evidence to conclude that the offenses of conviction constitute property offenses.   However, **in light of the government's request to allow community members to testify at a sentencing hearing, such a finding will likely need to be revisited in the event community members can establish harm to their property or physical injury, which may include particulate matter originating from the Tonawanda Coke plant that settled onto their property and short term health effects from air pollution**.

(Docket No. 261 at 3 n. 1 (emphasis added).)  Accordingly, the Government "now moves this Court to designate any members of the Tonawanda and Grand Island communities who were harmed by the [D]efendants' illegal air pollution as crime victims under the Crime Victims' Rights Act ("CVRA"), and additionally urges this Court to hold a sentencing hearing at which time community members can testify regarding the harm they suffered as a result of the defendants' conduct." (Docket No. 261 at 4.)

The Government argues that community members have been harmed by defendants' actions in two ways: (1) "the community members have had to endure the emotional trauma of living in a polluted environment and being subjected to uncontrolled noxious emissions;" and (2) "the community members are at increased risk of contracting future illnesses relating to the defendants' pollution, which is certainly an unsettling and deeply disturbing notion." (Docket No. 261 at 13-14.)  Highlighted from the victim impact statements are examples of quality of life issues, property damage, and medical problems. (Id. at 14-17.) The Government therefore argues that a sentencing hearing is necessary because "there are open questions as to which individual community members will qualify

as crime victims under the CVRA." (Id. at 19-20.)

Under the CVRA, certain specific rights are acknowledged, including the "right to be reasonably protected from the accused;" the "right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding;" and the "reasonable right to confer with the attorney for the Government in the case." 18 U.S.C. § 3771(a).  The term "crime victim" is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e); see In re Rendon Galvis, 564 F.3d 170, 173 n. 1 (2d Cir. 2009).  "The requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses." Galvis, 564 F.3d at 175 (citing In re Antrobus, 519 F.3d 1123, 1126 (10th Cir. 2008) (Tymkovich, J., concurring)); United States v. Sharp, 463 F. Supp. 2d 556, 568 (E.D. Va. 2006). "The necessary inquiry is a fact-specific one." Galvis, 564 F.3d at 175.  Further, "in determining whether one qualifies as a victim, a sentencing court can only consider the offense or offenses for which the defendant was convicted." United States v. Battista, 575 F.3d 226, 231 (2d Cir. 2009) (citing Hughey v. United States, 495 U.S. 411, 413, 110 S. Ct. 1979, 109 L. Ed. 2d 408 (1990)).  Thus, it is "[t]he loss caused by the conduct underlying the offense of conviction [that] establishes the outer limits of a restitution order." Battista, 575 F.3d at 231.

The potential individual CVRA victims, as described by the Government, are "any members of the Tonawanda and Grand Island communities who were harmed by the defendants' illegal air pollution." (Docket No. 261 at 4.)  This category potentially includes any person who lived in these two geographic areas from July 29, 2005 through December 31, 2009, the time period for which Defendants were convicted of emitting coke oven gas

into the atmosphere in violation of the Clean Air Act.   This Court notes that, as the Government concedes, these potential victims will need to be individually vetted to determine whether he or she was either directly and proximately harmed as a result of these violations.   (Docket No. 261 at 19-20.)   Each individual determination would be extremely fact specific. <u>Galvis</u>, 564 F.3d at 175.   Further, because the Government was not required to establish harm as an element of any offense for which Defendants were convicted, each determination would require the presentation of entirely new evidence, meaning that the designation hearing alone could involve hundreds of witnesses, including not only the community members themselves, but environmental and medical experts for all parties to testify on the issues of causation and damage.

Notably, at least one court has relied on a representative sample of fifteen community members in determining whether to grant community-wide CVRA status. <u>See</u> <u>United States v. CITGO Petroleum Corp.</u>, 893 F. Supp. 2d 848, 853-54 (S.D. Tex. 2012).[1] Even if this Court were to find such an approach appropriate, this representative method would not be a viable option for determining each community member's right to  "full and timely restitution as provided in law," a right also assured by the CVRA. <u>See</u> 18 U.S.C. § 3771(a)(6).   Instead, significant briefing and testimony would nonetheless be required to determine the extent to which, if any, each individual's loss was caused by Defendants' illegal conduct. <u>See</u> <u>United States v. CITGO Petroleum Corp.</u>, 2:06-cr-00563, Docket No. 882 (S.D. Tex. July 3, 2013) (order noting variety of restitution requests in the 820 Victim

---

[1] <u>Citgo Petroleum Corp.</u>, 2:06-cr-00563 Docket No. 838 (S.D. Tex. Oct. 17, 2012) (order clarifying that "all persons who lived near the CITGO East Refinery between January 1994 and May 2003 who can establish that they experienced adverse health effects as a direct and proximate result of emissions from Tanks 116 and 117" would be granted CVRA victim status).

Impact Statements).  Such proceedings would greatly affect the ability to impose sentence "without unnecessary delay," as required by the Federal Rules of Criminal Procedure.  Fed. R. Cr. P. 32(b)(1).

The determination that such hearings would be inappropriate in connection with this sentencing is not simply an attempt to avoid lengthy proceedings. Nor is this a finding that there are no serious questions regarding potential harm – indeed, there certainly are.  This decision is instead the result of the balancing of many factors, including the need to provide finality to the criminal proceedings in a manner that is fair and just, and to allow further efforts toward remediation, rehabilitation, and accountability to move forward.

To that end, it is important to note that the issues raised during a CVRA or restitution hearing or series of hearings would be essentially the same as those currently being considered by the New York State Supreme Court of Erie County in the twenty related lawsuits currently pending against Defendants. These suits include a mass tort action in which 268 plaintiffs have joined and an as-yet uncertified class action with three potential subclasses. Extended sentencing proceedings here could cause undue delay in the prosecution of those proceedings, to the detriment of all parties involved.  Further, factual determinations made by this Court could cause collateral estoppel issues that may interfere with the parties' and the state courts' resolution of these suits. To provide some context, this Court notes that the defendants in United States v. CITGO Petroleum Corporation were found guilty in June 2007, however sentencing proceedings lasted more than six years and the issue of restitution is not yet final as of today. Thus, even if the Government's motion were granted, this Court would nonetheless decline to order restitution because "the complication and prolongation of the sentencing process resulting

7

from the fashioning of an order of restitution [would] outweigh[] the need to provide restitution to any victims." 18 U.S.C. § 3663(a)(1)(B)(ii).  In contrast, declining to consider restitution at this time will not foreclose any potential victim's right to recovery in a civil suit.

Similarly, "[i]n a case where the court finds that the number of crime victims makes it impracticable to accord all of the crime victims the rights described . . ., the court shall fashion a reasonable procedure to give effect to this chapter that does not unduly complicate or prolong the proceedings." 18 U.S.C. § 3771(d)(2).  Thus, the failure to designate individual victims will not adversely affect the manner in which numerous designated victims would be assured of the other rights afforded by the CVRA, such as the right to timely notice of public court proceedings, the reasonable right to confer with the attorney for the Government, and the right to be reasonably heard at sentencing.   18 U.S.C. § 3771(a)(2),(4),(5).  Here, the Government has made significant efforts to ensure that community members are kept informed of the proceedings, including community presentations.  Further, both the Government and Defendants have submitted over 160 statements from individuals and local businesses that describe the impact, both positive and negative, from Defendants' presence in the community and the conduct underlying the present offenses.

The Court has been presented with and considered the community service projects that residents of the impacted communities recommend be funded by Defendant Tonawanda Coke as terms of probation. (Docket No. 232-234.)  These recommendations were the result of community meetings, committee work to detail and finalize the considered projects, and multiple days of voting opportunities in both the Town of Tonawanda and Grand Island. (Docket No. 233.)  The polling locations were staffed by 18

volunteers, and 561 community members ultimately participated. (Id. at 2-3.) Accordingly, the Court is confident that the voices of those affected and those that would potentially be affected by the present sentencing will be heard without any undue delay of the sentencing itself.

Finally, because the Court will not be making findings regarding any actual damage resulting from Defendants' actions, neither the community members nor Defendants will be adversely affected in the ongoing state civil actions.  The Government's motion for a hearing on the designation of individual community members as victims under the CVRA is therefore denied.


**B.        Seriousness of the Offenses**

As noted above, the Court is well aware of the impact these sentences will have on not only the Defendants, but the community as well.  The determination of sentences that are "sufficient, but not greater than necessary" to provide a just punishment to each Defendant and deter future similar conduct by other companies and individuals in Tonawanda's industrial corridor and elsewhere is not an easy task. 18 U.S.C. § 3553(a). It requires the balancing of multiple factors, including the nature of the offenses themselves, the actual and threatened impact of Defendants' conduct, and the promotion of continued rehabilitation and remediation.  Accordingly, the following discussions address (1) the offenses themselves; (2) Defendants' request to present expert testimony regarding the relative severity of the crimes, (3) additional sentencing factors this Court finds relevant to severity, including evidence of actual harm, parallel proceedings, breach of trust, and acceptance of responsibility; and (4) Defendant Kamholz's objections to the recommended

9

Sentencing Guideline offense level calculation.

      1.    <u>The Convicted Offenses</u>

Both Defendants were convicted of five counts of violating the Clean Air Act ("CAA") as a result of the operation of a pressure relief valve ("PRV") from July 29, 2005 to December 31, 2009 in violation of Tonawanda Coke's Title V permit requirements. (Counts 1-5.)   The PRV was set to open when the pressure in the coke oven gas line exceeded the pressure setting for the valve, at which time coke oven gas would be released directly into the atmosphere.   Coke oven gas contains benzene, a recognized carcinogen. Further, coke oven emissions are independently classified as a hazardous air pollutant, even without quantifying the amount of benzene therein. 42 U.S.C. § 7412(b)(1); 40 C.F.R. § 61.01.  Testimony at trial established that the pressure was set at such a level that the PRV would frequently open during normal production, and could emit coke oven gas as often as every 20 or 30 minutes for 10 seconds or more each time during high production.

Defendants were both further convicted of an additional 6 counts of violating the CAA by operating quench towers without a baffle system installed, also in violation of permit requirements. (Count 9 (tower #1) and Counts 11-15(tower #2).)   Baffles are pollution control devices used to disrupt or deflect particulate emissions rising from the quench tower as a result of the quenching process.  Tonawanda Coke applied for and was granted an exemption from the baffle requirement for tower #1, with the condition that the tower be used less than 10% of the time.  The jury found that Defendants violated that condition between January 1, 2008 through December 31, 2008. No exemption was granted with respect to tower #2, although one had been previously requested, therefore

Defendants were found to have operated that tower in violation of the permit requirements from July 29, 2005 through November 15, 2009.

Counts 17-19 reflect convictions for violating the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(d)(2)(A). Counts 17 and 18 involve what have been referred to as the Barrett Tanks, two storage tanks containing a waste exhibiting the toxicity characteristic for benzene that had been abandoned on the property by a prior owner before Tonawanda Coke purchased it in 1978.  The jury found that Defendants' active management of the hazardous waste from these tanks, and therefore their liability for the unpermitted storage thereof, began in May 1998 and continued through December 2009.  Defendants were also convicted of improperly disposing of waste from the tanks, as well as decanter tank tar sludge from coking operations (count 19), by mixing this material with coal on the ground in a coal field on the property.  The mixture would remain there, usually for a day, before being recycled in the coke ovens.

Defendant Mark Kamholz alone was convicted of a single count for obstruction of an agency proceeding. (Count 16.)  Underlying that conviction was Kamholz's instruction to an employee in anticipation of the arrival of the EPA investigation team in April 2009 to ensure that the PRV did not go off while inspectors were present.


2.    Necessity of Expert Testimony

Defendant Tonawanda Coke asserts that "the nature and seriousness of environmental offenses vary widely depending on a number of factors, including the regulatory context of the offense, the nature of the conduct giving rise to the offense, the presence or absence of related culpable conduct, and the environmental harm." (Docket

No. 229 at 14 (citing U.S.S.G. §§ 2Q1.2-1.4).)  Therefore "Tonawanda Coke respectfully

requests that the Court receive and consider the testimony of two expert witnesses to

address the nature and seriousness of the offenses of conviction in this case." (Id. at 14.)

The requested experts would be expected to testify to the following issues:

> [W]ith respect to the RCRA offenses, Stephen Johnson is prepared to offer
> his opinions and explain the bases for his opinions that this case is atypical
> from most environmental criminal enforcement matters because most
> criminal enforcement cases are pursued following a history of failed
> administrative or civil enforcement efforts to achieve compliance.  In this
> case, for 20 years prior to the filing of criminal charges, the [New York State
> Department of Environmental Conservation ("NYS DEC")] inspectors had
> concluded that the facility was complying with the applicable regulatory
> requirements.  Mr. Johnson also will testify that an evaluation of the available
> data regarding actual or potential environmental harm in this case does not
> indicate that the plant's management of decanter tank tar sludge made any
> significant contribution to any environmental harm at or around the plant.

(Docket No. 229 at 14-15.)

> With respect to the CAA offenses, Tonawanda Coke proffers the testimony
> of John Holmes, who is prepared to offer his opinions and explain the bases
> for his opinions that CAA regulation and inspections for coke oven plants
> focus primarily on the coke oven batteries because it is understood to be the
> primary source for the emission of hazardous air pollutants ("HAPs").  This
> is confirmed by the history of regulatory oversight of the Tonawanda Coke
> facility.  With respect to the PRV [pressure relief valve], the facts of this case
> show that the emission of HAPs from the PRV would have been low, at least
> until the light oil recovery system was taken off-line in November 2008.
> Lastly, he will offer his opinion that quench tower baffles are an insignificant
> control device that are marginally effective only as to large particulate matter,
> which is understood to be a less significant health threat than small
> particulates.

(Docket No. 229 at 15.)

Initially, to the extent that Defendants seek to establish that no environmental harm

resulted from their actions, the Court will deny the request for the same reason that the

CVRA hearing was denied.  A factual determination regarding causation, or the lack

thereof, would require a significant second evidentiary trial – one that would likely be more extensive than the initial trial on the merits.  Further, the Court will not consider evidence that little to no environmental harm resulted from Defendants' misconduct without also affording the effected communities an opportunity to present contrary evidence of actual damage.

The remaining topics to be discussed by the expert witnesses involve issues already raised at trial.  The jurors heard evidence regarding Defendants' prior compliance and other positive interactions with NYS DEC inspectors, and they were instructed on Defendants' defense of entrapment by estoppel. That defense was rejected by the jury and will not be relitigated during this sentencing proceeding. Defendants have other avenues in which arguments challenging the merits of their convictions can be more appropriately considered. Further, the Court will take notice of the testimony regarding the limitation of the baffle system, specifically its ability to collect only certain size particulates, was already brought out during the trial testimony of NYS DEC Inspector Gary Foersch, as was a contrary opinion from NYS DEC Regional Air Pollution Control Engineer Alfred Carlacci that baffles were 50 to 90% effective in removing particulates from emissions.

Defendants' request to present expert testimony at a sentencing hearing is therefore denied.


3.   Sentencing Factors

Although Defendants' request for expert testimony has been denied, this Court is not without significant information on which to base preliminary findings with respect to the severity of Defendants' conduct.  Defendants have, in fact, jointly and separately raised

several arguments in that regard.   Specifically, Defendants rely on the absence of conclusive evidence that their conduct resulted in actual harm to person or property and the significant parallel administrative and civil actions as mitigating factors for the purpose of sentencing.

In addressing these arguments, the Court recognizes that each Defendant must be sentenced separately.   Further, as an organizational defendant convicted of an environmental crime, the Sentencing Guidelines are not applicable for the purpose of determining either a base fine calculation or fine range for Defendant Tonawanda Coke. U.S.S.G. § 8C2.1. However, the Court agrees with Tonawanda Coke that the Guidelines can nonetheless assist in providing context to the present offenses for both Defendants. (See Docket No. 229 at 12-14.) Indeed, as recognized in the introductory commentary to Chapter Eight of the Guidelines, '[o]rganizations can act only through agents and, under federal criminal law, generally are vicariously liable for offenses committed by their agents." Therefore, the Court finds the following issues common to both Defendants, and will address them accordingly.

*i. Finding of Actual Harm*

As noted above, Defendants argue that the seriousness of the offenses on which they were convicted is mitigated by the absence of proof that actual harm or environmental contamination resulted from their conduct. (See e.g. Docket No. 229-9 (private consultant's analysis that "the shutdown of the [light oil] recovery system and capping of the [pressure relief valve] did not have any discernible impact on the benzene concentrations observed downwind of the facility"); Docket No. 238 (Defendant Kamholz's adoption of Tonawanda Coke's environmental harm submissions); Docket No. 241 at 6 (arguing estimation by an

14

EPA employee at trial that 172 tons of coke oven gas was emitted from the PRV per year was incorrectly calculated); Docket No. 241 at 10 (Tonawanda Coke "evaluated the potential impacts on the groundwater resulting from potential contamination of the coal storage area" with NYS DEC oversight and "determined that any contamination of the groundwater caused by placing coal tar sludge on the coal piles in the coal fields was *de minimus*"); see also March 20, 2013 Trial Testimony of EPA Inspector Gary Foersch (relating his discussion with Defendant Kamholz regarding the lack of efficiency of tower baffles).)

This Court declines to find any of the offenses on which Defendants were convicted to be *de minimus* because the issue of any actual harm has not yet been resolved. The statutes violated by Defendants permit the imposition of significant monetary fines, as well as incarceration for individual defendants, without requiring proof of actual damage. Further, although Tonawanda Coke is certainly not the only emission source or even violator in the Tonawanda area, in environmental cases, "the challenged harm often results from the cumulative effects of many separate actions that, taken together, threaten the . . . interests [of others]." Connecticut v. American Elec. Power Co., Inc., 582 F.3d 309, 349 n. 24 (2d Cir. 2009) (quoting Northwest Env. Defense Ctr. v. Owens Corning Corp., 434 F. Supp. 2d 957, 963 (D. Or. 2006)), *rev'd on other grounds*, 131 S. Ct. 2527 (2011).  The RCRA in particular underscores the danger of the cumulative effect of noncompliance by imposing a penalty for each day of a violation. 42 U.S.C. § 6928(d).  Similarly, the Sentencing Guidelines reflect that the severity of the crime is increased by the continuous or repetitive nature of the illegal emission or discharge of a hazardous substance into the environment.  U.S.S.G. § 2Q1.2(b)(1)(A).

15

Here, the trial evidence establishes that the PRV was set to release coke oven gas frequently during normal operation over four and a half years.  Defendants operated quench tower #2 without a required baffle for the same length of time, with the exception of an at least six-month period in 2008 when witnesses testified that quench tower #1 was used exclusively.  Similarly, the unpermitted storage in violation of the RCRA, occurred over an eleven-year period and the conduct underlying the two counts of improper disposal occurred over a four-month and four-year period respectively.

The Second Circuit has recognized that such repetitive illegal emissions and discharges reflect an increased culpability even without explicit proof of harm.   In considering the Guidelines' application note that this provision "assumes a discharge or emission into the environment resulting in actual environmental contamination," the Court rejected the argument that this requires an explicit finding of "actual environmental contamination." United States v. Liebman, 40 F.3d 544,  550 (2d Cir. 1994); see U.S.S.G. §2Q1.2 cmt. 5.  Instead, "[t]he application note states the obvious-that when a hazardous or toxic substance is discharged into the environment, it will be assumed that contamination of that environment ordinarily ensues." Liebman, 40 F.3d at 550-51; see United States v. Mathis, 738 F.3d 719, 739 (6th Cir. 2013); United States v. Perez, 366 F.3d 1178, 1182 n. 4 (11th Cir. 2004); United States v. Catucci, 55 F.3d 15, 18 (1st Cir. 1995); United States v. Goldfaden, 959 F.2d 1324, 1330-31 (5th Cir. 1992); see also United States v. Bogas, 920 F.2d 363, 368 (6th Cir. 1990) (distinguishing between contamination and harm). Thus, where hazardous material has been continuously discharged into the environment, a sentencing enhancement is warranted even if a third-party or other factor limits or precludes any actual harm from resulting.  See United

16

States v. Van Loben Sels, 198 F.3d 1161, 1166 (9th Cir. 1999) (refusal to apply upward adjustment for continuous discharge of benzene-contaminated wastewater into sewer system clearly erroneous despite fact that city sewer system ultimately contained hazardous levels of same); United States v. Spain, 591 F. Supp. 2d 970, 975 (N.D. Ill. 2008) (neither the volume of the discharge nor the amount, if any, of environmental harm precludes an upward adjustment for an ongoing, continuous or repetitive discharge). This is further supported by the fact that the Guidelines provide a separate enhancement for the release of hazardous or toxic substances which "resulted in a substantial likelihood of death or serious bodily injury." U.S.S.G. § 2Q1.2(b)(2).

This Court therefore finds that, even if the emission or discharges were minimal, as Defendants argue, the prolonged nature of the violations warrant a finding of severity. To hold otherwise would allow long-term violators to benefit from the difficulty in quantifying the actual harm to the environment and avoid the consequences of their intentional actions.

The severity of the present offenses is also reflected in Defendants' refusal to comply with the regulatory schemes governing their industry, one in which they have made millions of dollars in profit, as this undermines the effectiveness of those schemes and the public's confidence that such industries can be competently carried out without endangering the communities around them. Indeed, as one court stated:

> [Defendant] argues [its] acts occurred over seven years ago, and involved nonhazardous wastes dumped into the sewers, not into the environment. This does not detract from the seriousness of the offense. The [Clean Water Act] creates a network of specialized treatment facilities, each designed to process certain types of waste. The entire system depends on each facility completing its part of the treatment process: if a pretreatment facility like [defendant] fails to remove oils and other industrial wastes from the water

17

stream, this inevitably affects the functioning of [publicly owned treatment facilities] downstream.  Thus, the remoteness of an offense and its lack of damage to the environment do not mean that the system as a whole did not suffer the consequences of [defendant's] offenses.  **In a framework that relies on self-policing, such factors cannot be treated as mitigating**.

United States v. Comprehensive Envtl. Solutions, No. 07-20037-1, 2009 WL 1856228, *5 (June 29, 2009) (emphasis added); see Griffin Indus. v. Irvin, 496 F.3d 1189, 1206-7 (11th Cir. 2007)("Accurate self-reporting is critical to the effective enforcement of environmental laws."), *cert denied*, 553 U.S. 1004 (2008); United States v. Chevron U.S.A., 380 F. Supp. 2d 1104, 1113 (N.D. Cal. 2005) (environmental regulators commonly rely on self-reporting and self-monitoring by regulated entities).  This sentiment is no less applicable to the regulatory acts at issue here, where a company's failure to ensure compliance with CAA and RCRA regulations will result in an increase in the cumulative impact of Tonawanda's industrial corridor on the area's businesses and residents.  The Court therefore declines to give significant weight to the fact that actual harm was not causally linked to either Defendant during these proceedings.

*ii. Parallel Administrative and Civil Enforcement Actions*

Tonawanda Coke argues that it has already faced "extensive parallel administrative and civil enforcement actions initiated by the United States Environmental Protection Agency ("US EPA") in 2009, many of which address the conditions or practices that were the bases for many of the counts of conviction." (Docket No. 229 at 16-17.) It is argued that, although civil and criminal enforcement mechanisms are generally aimed at distinct enforcement interests, here there is "such extensive overlap" that it should be acknowledged that "many of the enforcement policy interests already have been vindicated." (Docket No. 229 at 17.) Tonawanda Coke provides a summary of the

18

numerous parallel administrative enforcement actions, proceedings, and settlement discussions. (Docket No. 229-2 at ¶¶ 23-33 Ex. A.)

Tonawanda Coke also requests that this Court consider that the company has "spent more than $11 million over the past three years to address, and intends to commit more money to continue to address, the concerns raised by the US EPA and NYS DEC since 2009." (Docket No. 229 at 6). Of that estimated amount, Tonawanda Coke asserts that only the $2.8 spent in remediation of the area around the former Barrett Tanks "arguably relates[s] to 'clean-up activity' associated with any of the counts of conviction." (Docket No. 229 at 6; Docket No. 229-2 ¶¶ 28-29 (Decl of Rick Kennedy, Esq.).) The remaining funds were therefore spent on the remediation of additional environmental issues. Indeed, Tonawanda Coke concedes that it has been subject to numerous additional requests for information and investigations by the NYS DEC, US EPA, and the Town of Tonawanda since 2009. (Docket No. 229-2 ¶¶ 23-33 Ex A.) The issues raised involved alleged violations of the Resource Conservation and Recovery Act, the Clean Water Act, the Comprehensive Environmental Response, Compensation, and Liability Act, the Emergency Planning and Community Right-to-Know Act, and the Clean Air Act. (Docket No. 229-2 ¶ 23 Ex A.) Notices of Violations, Administrative Compliance Orders, and Consent Agreements and Final Orders were issued "regarding various aspects of the facility's operations," including, for example, sealing and ducting of openings on tar intercepting sumps, rehabilitation of the ammonia scrubber system and tar precipitator, cyanide emissions in excess of permit, and excessive coal charging emissions. (Docket No. 229-2 ¶ 25 Ex. A; see Docket No. 218 (US EPA October 2009 summary of findings and additional areas of concern resulting from April 2009 investigation).)

19

Defendant Tonawanda Coke argues that these administrative proceedings should favor in mitigation because they evidence "a good cooperative working relationship" with the environmental regulatory agencies. (Docket No. 229-2 ¶¶ 23-24, 31.) This assertion appears to be based on the fact that, although Tonawanda Coke does "not admit or accept any of the factual allegations, findings, legal conclusions or other assertions made by the applicable overseeing agency" and "reserve[s] its rights to contest all such matters," the company nonetheless "agreed to undertake the work necessary to address the issues raised by the Agencies." (Docket No. 229-2 ¶ 31.)  In this Court's view, these actions therefore do not reflect the sort of voluntary efforts toward compliance that warrant mitigation.  Instead, they are responses to what the environmental oversight agencies have found to be a continued need for intervention.  These proceedings evidence, if anything, Defendants' history of reacting to the discovery of violations rather than the voluntary creation of a "cooperative working relationship" with environmental oversight agencies. For example, although Defendants assert that the PRV was capped prior to indictment, this action was not taken until after a criminal complaint issued and Kamholz was arrested. Thus, the capping was similarly reactive rather than voluntary and, although the initial complaint did not specifically reference the PRV, appears more indicative of consciousness of guilt than a change in attitude. Further, it is argued that "most of the work" was not "expressly required" by regulatory agencies, however, the additional upgrades and modifications were nonetheless not voluntary.  As stated by Tonawanda Coke's counsel, these changes were the result of the "agencies' broad interpretations of general regulatory duties under the Clean Air Act and Clean Water Act." (Docket No. 254-1 ¶ 12(b).) Compliance with an agency's directive despite having reservations about that agency's

regulatory interpretation, even if the reservation is legitimate, is similarly reactive and does not reflect voluntary efforts to ensure that Tonawanda Coke's operations do not benefit its management at the expense of the surrounding communities.

Finally, Tonawanda Coke's reliance on the expenditure of funds to remedy the CAA violations also requires further comment.  The company asserts that "in late 2009 and early 2010," Tonawanda Coke spent approximately $75,000 to install baffles on the eastern and western quench towers. (Docket No. 229 at 8.) It was the absence of these baffles that resulted in the convictions for six counts of the indictment and a maximum possible fine on those counts of $3 million. The cost to comply with the permit requirements at the outset, however, was less than 2% of Tonawanda Coke's admitted net income for 2005, the year of the earliest CAA violation.  Similarly, the cost of capping the pressure relief valve was itself negligible. The Court gives weight to the fact that if Tonawanda Coke had made these relatively small expenditures to bring itself into compliance at that time, the community would not now be faced with the cost and concern stemming from the unquantifiable amount of benzene in the coke oven gas that was consistently emitted during the violation periods.

### iii.  Breach of Trust

Notably, the Sentencing Guidelines provide for an enhancement of a sentence based on the abuse of the public trust during the commission of an offense. U.S.S.G. § 3B1.3. This issue has been discussed by the parties with respect to only Defendant Kamholz, as Tonawanda Coke is not subject to an offense level calculation for the present offenses.  Nonetheless, this Court finds a discussion of public and private trust particularly relevant to the environmental crimes of which both Defendants have been convicted.

21

Section 3B1.3 provides:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

" 'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S .G. § 3B1.3 cmt. 1; see also United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001) ("[T]he defendant's position must involve discretionary authority."). The Second Circuit has held that the "[t]he primary trait that distinguishes a position of trust from other positions is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." United States v. Laljie, 184 F.3d 180, 194 (2d Cir. 1999)(internal quotation marks omitted).

The CAA and RCRA, like all environmental regulation acts, are public welfare legislation, and therefore the victim of any offenses under these acts includes the public. United States v. Snook, 366 F.3d 439, 446 (7th Cir. 2004);   United States v. Technic Servs., 314 F.3d 1031, 1048 (9th Cir. 2002), overruled on other grounds by United States v. Contreras, 593 F.3d 1135 (9th Cir. 2010). Further, these complex regulatory schemes require significant esoteric knowledge by regulators and the parties subject to regulation, therefore a violation – particularly a minor but continuous one – would be difficult to detect. There can thus be no doubt that the community surrounding a company operating in a regulated industry must rely on that company and its employees to ensure its own

compliance and trust that the company will not place its own monetary interests above the safety of others.  United States v. Gonzalez-Alvarez, 277 F.3d 73, 81-82 (1st Cir. 2002) (public was entitled to rely on dairy farmers to comply with all applicable regulations); United States v. Turner, 102 F.3d 1350, 1360 (4th Cir. 1996) (breach of public trust where society trusted mine operators to follow mine safety laws and ensure miners received required safety training).

This abuse of the public trust, however, underlies every knowing violation of the CAA and the RCRA.  This Court therefore finds this factor to be one that is already "included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3; see United States v. Broderson, 67 F.3d 452, 456 (2d Cir. 1995).  As such, although this Court finds Defendant Tonawanda Coke's breach of the public trust significant for the purposes of determining the applicable sanction for this defendant, this factor alone will not support an *additional* two-level enhancement to Defendant Kamholz's base offense level.

This is not to say that an abuse-of-trust enhancement will never be appropriate in an environmental case.  An enhancement based on public trust has been found appropriate where the defendant also had a fiduciary or other special relationship with the public, such as where he was a government employee. See United States v. White, 270 F.3d 356, 371-73 (6th Cir. 2001) (enhancement appropriate where defendant was the general superintendent of a county water district).  Similarly, evidence of a special skill, one not possessed by members of the general public and gained by substantial education, training, or licensing, may also warrant this enhancement. U.S.S.G. § 3B1.3 cmt. n. 4.  The application is thus appropriate where a defendant's training and experience as a licensed water treatment plant operator "made it significantly easier for her to falsify turbidity

23

readings and to conceal falsifications from regulators." White, 270 F.3d at 373.  An enhancement based on a breach of public trust is not appropriate, however, where "an individual [is] functioning in a private capacity, not entrusted with any special discretion under law or by a government permit, license, or contract as to how to comply with governmental health and safety standards." United States v. Atlantic States Cast Iron Pipe Co., 627 F. Supp. 2d 180, 273 (D. N.J. 2009).[2]

This does not, however, end the discussion.  As stated in the Guidelines, this enhancement may also be based on an abuse of *private* trust. U.S.S.G. § 3B1.3.  Such an abuse may occur where a defendant employer or manager uses his or her position to exert leverage over employees, thereby enabling the defendant to either convince employees to commit violations or conceal from them the hazardous nature of the conduct. Turner, 102 F.3d at 1352, 1360 (defendants mine operators' threat of termination to force miners to falsely certify that they were provided eight hours of health and safety training required by law was an abuse of private trust); Technic Servs., 314 F.3d at 1053 (recognizing that defendant's conduct in altering employee's personal air-monitoring devices "clearly place workers in jeopardy" and "arguably constituted a violation of [defendant's] position of private trust").

---

[2]This conclusion is necessarily a partial rejection of the cases in the Fourth and Seventh Circuits that have applied the public trust enhancement to private individuals based solely on the effect the environmental law violation potentially had on the public. United States v. Snook, 366 F.3d 439, 445-46 (7th Cir. 2004) (petroleum refinery's environmental manager occupied position of trust with respect to the public because "unlike other self-reporting situation (taxpayers, for example), the regulations here apply to matters that directly and significantly affect the public's health and safety"); United States v. Turner, 102 F.3d 1350, 1360 (4th Cir. 1996) (breach of public trust where society trusted operators of private mining company to follow mine safety laws and ensure miners received required safety training). But see Snook, 366 F.3d at 447-48 (Coffey, J, dissenting) (defendant did not occupy a fiduciary or quasi-fiduciary position with respect to the public because it was not the public that placed him in the position of environmental manager and thus entrust him with complying with the Clean Water Act's reporting requirements).

24

Here, there was certainly sufficient evidence that Defendant Kamholz had complete control over environmental compliance matters and the absence of any environmental training provided by Defendant Tonawanda Coke.  Several former plant managers testified that they were often required by Kamholz to sign compliance or monitoring forms which they did not prepare or understand.   One former plant manager even testified that he did not know what a Title V permit was.  This evidence, however, does not equate with the threats or knowing endangerment that would warrant the imposition of a breach of private trust enhancement.  Instead, based on the evidence offered during this trial, Tonawanda Coke's employees stood in a position no different than members of the general public.

### iv. Acceptance of Responsibility

Finally, this Court finds that neither Defendant has accepted responsibility for the present convictions. Defendants instead minimize their conduct as mere failures in communication with regulatory agencies.  Defendant Kamholz further argues that, for example, he had no knowledge of how the PRV worked or how frequently it was releasing gas, and that he was not specifically informed that the mixing of the sludge on the side of coal piles violated any regulation. The evidence at trial, however, was more indicative of knowing violations of permit requirements. Indeed, the jury found Defendant Kamholz's conduct during the April 2009 investigation egregious enough to warrant a conviction for the obstruction of the EPA investigation. See 18 U.S.C. § 1505.   Moreover, such statements fail to acknowledge that as the company's environmental compliance officer, Kamholz had a duty to ensure that he had sufficient knowledge and understanding of both regulatory requirements and the company's methods and equipment to ensure that Tonawanda Coke's activities could be carried out without violating environmental laws. In

25

the absence of any recognition of the failure of Kamholz to perform this duty, and the failure of Tonawanda Coke to ensure that this duty was performed, the Court cannot find that there has been an acceptance of responsibility by either defendant.

4.    Defendant Kamholz's Objections to the PSR's Offense Level Calculation

In addition to the factors listed in 18 U.S.C. § 3553(a), the determination of Defendant Kamholz's sentence requires that this Court also consider the advisory Sentencing Guidelines range.  United States v. Ingram, 721 F.3d 35, 37.  He has raised several objections to the recommended Sentencing Guideline calculation in his presentence report, which the Court will now address.

Initially, as discussed above, although the issue of the breach of trust, both public and private, is certainly significant to the environmental crimes on which Defendant Kamholz was convicted, the facts of this case do not warrant an additional two-level enhancement to his base offense level. Defendant Kamholz is not a government employee, and he does not hold a license or advanced degree that can be fairly said to have facilitated his commission of the present offenses.  Further, the Court has already concluded that a downward adjustment for the acceptance of responsibility is not warranted here.

Defendant Kamholz further argues that a supervisory sentencing enhancement is inappropriate because there is no evidence he supervised another participant. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. 1. The Second Circuit has recognized that this enhancement is not appropriate when the supervised participants were

26

unwitting accomplices. See United States v. Skys, 637 F.3d 146, 158 (2d Cir. 2011); United States v. Leonard, 37 F.3d 32, 38 (2d Cir. 1994). Such is the case here. Testimony established that employees were given no environmental training, but instead relied solely on Defendant Kamholz. Indeed, when questioned about the legality of certain conduct, Defendant Kamholz would assure that, for example, the use of the PRV was legal and that a tower was a 'station' that did not require a baffle. The two-level sentencing enhancement is therefore not appropriate. However, the Court notes that this withholding of information and the lack of environmental training contributed to the convicted offenses, and will therefore give weight to this when determining what sentence within the guideline range is appropriate.

Also disputed is the recommended four-level enhancement based on the fact that the Barrett Tank "cleanup required a substantial expenditure." U.S.S.G. § 2Q1.2(3). Kamholz acknowledges that Tonawanda Coke spent over $2.6 million in remediation of the area around the Barrett Tanks, but argues that this amount includes the cleanup of the historical contamination that predated Defendants' criminal conduct. See United States v. Russo, 281 F. App'x 43, 46-47 (2d Cir. 2008) (considering whether sentencing court made sufficient finding that costs were for the cleanup of contamination caused by defendant). The parties do not dispute, and indeed the jury was informed, that the Barrett Tanks existed on the property prior to its purchase by Tonawanda Coke in 1978, at which time some of the material in those tanks had already spread out onto the ground. (Docket No. 155.) Nonetheless, the jury found that Defendants engaged in active management of this hazardous waste from 1998 onward and they were therefore criminally liable for the unpermitted storage of this material on the ground adjacent to two large deteriorating

27

tanks.

At first blush the application of this enhancement based on the substantial sum expended in the cleanup of Defendants' illegal storage seems straightforward.  However, as Defendant Kamholz argues, the Second Circuit's decision in Russo implies that a but-for causation test is required when considering what costs may be considered.  As such, the enhancement is appropriate only where remediation would have been unnecessary or minimal absent a defendants' criminal conduct.  Russo, 281 F. App'x at 46-47 (enhancement proper where government established that facilities for which expenses had been incurred were clean prior to defendant's illegal conduct).  Although this Court cannot agree that the entire amount of the contamination surrounding the Barrett Tanks[3] is "historical," it cannot be determined what amount of the cleanup is directly attributable to Defendants' post-1998 conduct.  The four-level enhancement will therefore not be added to Kamholz's offense level.

Finally, Defendant Kamholz argues that he should be afforded a two-level downward departure due to the lack of environmental harm or contamination with respect to the enhancements for both "ongoing, continuous, or repetitive discharge, release, or emission" and the violation of a permit.  U.S.S.G. § 2Q1.2(b)(1),(4).  As discussed above, the contamination is presumed and distinguishable from a finding of actual harm causally linked to Defendant Kamholz's actions. Such a link has not been established in these criminal proceedings.  A two-level downward departure will be granted with respect to the

_____

[3]The question of what harm was caused by Defendants' removal of the hazardous waste from these tanks for mixing on the coal field is a separate issue.  Indeed, the Government argues that a remedial investigation is required to determine the nature and extent of the contamination resulting from this conduct. (Docket No. 246.)

permit violation enhancement.   However, the duration of the "ongoing, continuous, or repetitive" offense is also a relevant factor in considering a departure from that six-level increase. Defendants' CAA violations occurred over a four and a half year period. Similarly, the repetitive conduct underlying count 19 in violation of the RCRA occurred over a four year period.  No departure is therefore warranted with respect to this enhancement.

After applying these adjustments to the recommended offense level and accounting for the grouping of offenses, Defendant Kamholz has a total offense level of 20 and a Criminal History Category of I, which results in a sentencing range of 33 to 41 months.

**C.      Consideration of Community Projects as a Condition of Probation**

Community service may be imposed upon a corporate defendant "as a condition of probation where such community service is reasonably designed to repair the harm caused by the offense." U.S.S.G. § 8B1.3.   The commentaries to the Sentencing Guidelines recognize that:

> An organization can perform community service only by employing its resources or paying its employees or others to do so.  Consequently, an order that an organization perform community service is essentially an indirect monetary sanction, and therefore generally less desirable than a direct monetary sanction.  However, where the convicted organization possesses sufficient knowledge, facilities, or skills that uniquely qualify it to repair damage caused by the offense, community service directed at repairing damage may provide an efficient means of remedying harm cause.
>
> In the past, some forms of community service have not been related to the purposes of sentencing.  Requiring a defendant to endow a chair at a university or to contribute to a local charity would not be consistent with this section unless such community service provided a means for preventive or corrective action directly related to the offense and therefore served one of the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

U.S.S.G. § 8B1.3 cmt.

Defendant Tonawanda Coke argues that the recommended community services projects are improper because the Government failed to present a sufficient showing of harm related to the conduct on which they were convicted. (Docket No. 241 at 15.) Tonawanda Coke asserts this is underscored by the fact that several of the projects are evaluative rather than remedial in nature. (Docket No. 241 at 19.)

This Court finds, however, that it is the evaluative projects which have the strongest nexus with Defendants' conduct.   Despite its probabilistic nature, the threat of environmental harm or injury therefrom can itself be a cognizable harm. Friends of the Earth v. Gaston Copper Recycling Corp., 204 F.3d 149, 160 (4th Cir. 2000) (reasonable fear and concern about effects of discharge, supported by objective evidence, directly affected recreational and economic interests); Mountain States Legal Found. v. Glickeman, 92 F.3d 1228, 1234-35 (D.C. Cir. 1996) (a probabilistic harm is not speculative where a defendant's actions increase its risk); Vill. of Elk Grove Vill. v. Evans, 997 F.2d 328, 329 (7th Cir. 1993) (probability of injury sufficient to take threat out of the realm of hypothetical); Northwest Envtl. Defense Ctr. v. Owens Corning Corp., 434 F. Supp. 2d 957, 963 (D. Or. 2006). The Supreme Court has also recognized that an injury in fact could be based on the reasonable concerns about the effects of unpermitted discharges, where those concerns directly affected recreational, aesthetic, and economic interests. Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167, 183-84, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). Further, the enactment by Congress of laws governing emissions and other contaminants, "and the participation by the United States in related international agreements, "also weigh against any suggestion that the threatened harm is entirely chimerical." Northwest Env. Defense Ctr., 434 F. Supp. 2d at 963-64.

30

As previously discussed, underlying all of Defendants' convictions is a breach of the public's trust that Tonawanda Coke would be operated in compliance with the laws and regulations designed to protect the surrounding communities from contamination and actual harm, whether that harm stems directly from Tonawanda Coke's action or from Tonawanda Coke's contributions to the overall level of pollution in the area. The impact on the community caused by the difficulty in understanding, not to mention quantifying, that potential harm should not be underestimated.  The Court therefore finds that, just as a requirement that a defendant remediate the physical result of its conduct is appropriate, a term of probation obligating Tonawanda Coke to help community members understand the effects – or lack thereof – of the pollutants to which they have been exposed is also appropriate.  See Comprehensive Envtl. Solutions, 2009 WL 1856228

Accordingly, this Court fully intends to impose, as a term of Tonawanda Coke's probation, a requirement that this Defendant fund one or more of the proposed evaluative projects recommended by the community.  In doing so, the Court is cognizant of the fact that such an order is essentially an indirect monetary sanction, and therefore the company's ability to pay must be factored into any determination.  Also relevant is the need for the accountability of any implementing organization, and therefore the Court will also consider criteria such as an organizational project leader's status as a recognized charitable organization in determining whether to impose a community service obligation.

**D.     Ability to Pay**

Prior to imposing a fine at sentencing, 18 U.S.C. § 3572(a) requires that a court consider several factors, including a defendant's income, earning capacity, and financial

resources. Defendant Tonawanda Coke asserts that due to the general economic recession and a downturn in the coke industry, the company's ability to pay a significant fine is limited. A defendant that claims the inability to pay all or part of a fine, even with a reasonable installment schedule, "must be given at least a minimal opportunity to show that he lacks the ability to pay the fine proposed by the court." United States v. Elfgeeh, 515 F.3d 100, 136 (2d Cir. 2008), *cert denied*, 555 U.S. 902 (2008); United States v. Thompson, 227 F.3d 43, 45 (2d Cir. 2000).

This does not mean, however, that a court has "an 'obligation to tailor the fine to the defendant's ability to pay.'" United States v. Gresham, 964 F.2d 1426, 1430 (4th Cir. 1992) (quoting United States v. Doyan, 909 F.2d 412, 415 (10th Cir. 1990)). A fine is meant to be a sanction, and the fact that the fine imposes a significant financial burden on a defendant does not constitute an abuse of discretion. United States v. Brantley, 537 F.3d 347, 353 n. 2 (5th Cir. 2008); Doyan, 909 F.2d at 414; see U.S.S.G. § 5E1.2(e) (the total combined sanction must still be punitive).

Here, both Tonawanda Coke and the Government have briefed this issue in their submissions, and the Court has received and reviewed the reports of the Government's financial expert, Leo J. Mullin, a "Cost Recovery Expert" for the US EPA, and Tonawanda Coke's expert financial analyst, CPA Stephen J. Scherf. Although both parties have indicated that these experts could be made available for a sentencing hearing on this issue, the Court finds that unnecessary. The difference between the experts' recommendations is severe and both are in some respects unrealistic, however, the submissions are sufficient to allow this Court to make an informed decision on the matter at sentencing. The Court notes that, to the extent any specific findings in support of that

decision are based on information disclosed pursuant to a consent order with the Government, prior to the pronouncement of sentence this Court will issue a decision that will be filed under seal for a period of two weeks.  Defendant Tonawanda Coke will be afforded an opportunity during that time to show good cause why the Court's specific findings should remain under seal.

      SO ORDERED.

Dated:  March 14, 2014
      Buffalo, New York

                  /s/William M. Skretny
                  WILLIAM M. SKRETNY
                     Chief Judge
             United States District Court